PHILLIP R. CLARK and FRANCES B. CLARK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clark v. Commissioner
Docket No. 5455-79.
United States Tax Court
T.C. Memo 1982-401; 1982 Tax Ct. Memo LEXIS 344; 44 T.C.M. (CCH) 492; T.C.M. (RIA) 82401; July 19, 1982. William V. Lewis, for the petitioners. F. Michael Kovach, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of Phillip R. and Frances B. *345 Clark for the taxable year 1971 in the amount of $13,889.18. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision whether the sum of $16,779.16 received by Phillip R. Clark during the taxable year 1971 from a partnership was a guaranteed payment under section 707(c)[1] and taxable as ordinary income. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Phillip R. Clark (petitioner) and Frances B. Clark, who were husband and wife during the taxable year 1971, filed a joint Federal income tax return for the calendar year 1971 with the Internal Revenue Center in Holtsville, New York. At the time of the filing of the petition in this case, Mr. Clark resided in Bloomfield Hills, Michigan, and Mrs. Clark resided in Norfolk, Virginia. Petitioner was a stockbroker and investment advisor. He had been an employee of, and later a special limited partner in, Frances I. duPont & Co. and its predecessor firm since July 1958. After successfully *346 managing several of the firm's branch offices, petitioner became a general partner on January 1, 1970, of the firm which, in July 1970, became F.I. duPont, Glore Forgan & Co. Petitioner remained a general partner through April 30, 1971. F.I. duPont, Glore Forgan & Co. was a member firm of the New York Stock Exchange and other securities exchanges and was organized as a New York limited partnership pursuant to the terms of Articles of Limited Partnership dated July 2, 1970. It was petitioner's belief that even though the name of the firm was changed, the partnership agreement dated July 2, 1970, contained the same provisions as the agreement prior to the change of name. Upon becoming a general partner in the partnership in January 1970, petitioner made a capital contribution of $54,000 consisting of $25,000 in cash transferred to his general partnership account from his special limited partnership account and $29,000 in promissory notes dated June 1, 1970. Petitioner paid $11,000 on these notes to the partnership on October 1, 1970. In return for this capital contribution, petitioner's interest in the profits and losses of the partnership was.4885993 percent (or 45 divided by *347 9,210). At the time of his admission into the partnership as a general partner, his compensation was not discussed. He understood, however, that his compensation was to come solely from the profits of the partnership. He did not receive at any time a separately specified salary from the partnership apart from the amounts here in issue. The partnership agreement provided as follows with respect to the right of a general partner to make withdrawals: FOURTH: (a) Each of the general partners may, with the consent of the Finance Committee, contribute additional general capital to the partnership (such contribution being herein called his "additional general capital"). (b) Subject to the approval of the Finance Committee, a general partner shall have the right to withdraw all or any portion of his additional general capital by giving notice in writing to the Finance Committee specifying the amount of such withdrawal. Such amount shall be paid to him six months after the last day of the calendar month in which such notice is given. The partnership may, at any time, return to a general partner, or to his legal representatives after his death, all or any portion of his additional *348 general capital. Article 10(b) provided that "Net profits may not be withdrawn by the general partners during the year in which they are earned by the partnership except with the consent of the Finance Committee." Article 8 of the partnership agreement provided that the partnership "shall pay the following items" in the stated order of priority. The items which were to be paid to the general partners were as follows: (b) To each general partner an amount computed at such rate or rates as the Finance Committee shall fix from time to time on (i) the amount of cash, and (ii) the capital requirements value (revalued on the last day of each month) of all property other than cash, constituting his additional general capital held in his additional general capital account, other than Secured Capital Notes. (d) To each general partner an amount computed at the rate of Fifty Dollars per annum per Unit held by such partner. (e) Such salaries to the general partners (payable at least monthly) as shall be determined from time to time by a majority in interest of the general partners. Article 14 of the partnership agreement provided that upon the death, adjudication of incompetency *349 or retirement of a partner, the value of that partner's interest was to be determined and paid to that partner or his representatives within six months after the date of such computation. However, if this computation "shows a net balance due the partnership, such balance shall be payable fifteen days after the date as of which such value was computed or at such later date as may be agreed upon by the Finance Committee." Article 26 of the partnership agreement provided that upon termination of the partnership, a full accounting of the partnership's assets and liabilities was to be made. If it was determined that a partner owed any amounts to the partnership, the agreement provided as follows: Any partner who is indebted to the partnership in liquidation shall promptly pay the amount of such indebtedness and no payment shall be made to him under this Article until such indebtedness shall have been paid in full by him to the partnership. In order to meet his monthly fixed living expenses, petitioner received monthly payments from the partnership. It was petitioner's understanding that each partner could take money out of the partnership in the amounts he felt he needed to live on *350 and then this amount would be deducted from his share of the partnership income which he would receive at the end of the year. He believed these amounts would be charged to his capital account and then he would get a check from the partnership at yearend to the extent that his share of the partnership profits exceeded the total amount of these payments. For nine months in 1970, petitioner received payments of $2,916.66 each month. For the months of July, August, and September, petitioner received payments of $2,666.66 per month. These payments continued in 1971 and, for the first four months of that year, petitioner received payments of $16,666.66 in the form of these monthly withdrawals and a separate payment of $112.50. In his personal capital account maintained by the partnership, the credit side of the statement showed that the $112.50 was characterized as "Int on Genl Cash Cap--Dec" and the other payments were characterized as "Salary." However, on the "debit" side of petitioner's personal capital account statement, his capital account was reduced by the total amount of these payments. The partnership's records entitled "Partners' Shares of Income and Credits, Year Ended *351 December 31, 1970," indicate that the so-called "Salary" payments, denominated "Drawing Account" payments, varied in amount amount the various partners and did not relate in any way to their capital interest in the partnership. These payments also did not necessarily reflect the amount or type of work performed by the individual partner for the partnership. In fact, one partner with a 7 or 8 percent capital interest only received payments of $2,666.67 in 1970. The so-called "Interest" payment of $112.50 in 1971 was listed under the heading "Interest on Capital." These payments to the partners were not a uniform percentage of their capital contributions. Beginning in 1970, the partnership sustained heavy losses which continued in 1971. Sometime in 1970, petitioner's capital account became a negative amount due to the amounts he had withdrawn and the fact that the partnership had large losses. Petitioner claimed on his return and was allowed by respondent the amount of $65,517 as his share of the partnership's distributable loss for 1970. In lieu of a Schedule K-1, the partnership submitted to petitioner a typed page indicating the amounts and appropriate lines on the Form 1040 *352 upon which these items were to be listed. The schedule stated under the heading of "Details which will not appear on individual Federal Income Tax Returns" that petitioner's total distributive share of the partnership losses for 1971 was $69,292.97. This loss was reduced by the amount of $16,666.66, which was listed as the total of his drawing account for the year 1971, and $112.50 listed as "Interest," leaving as his distributive share of the partnership losses the amount of $52,513.83. This amount represented the balance to be charged against petitioner's capital account. Petitioner did not claim this amount as a deduction on his 1971 income tax return. The partnership terminated on April 30, 1971. Pursuant to an agreement dated March 17, 1971, a corporation purchased the assets of the partnership and petitioner then worked for the corporation for the following two years. For the remaining seven months of 1971, petitioner was paid a salary of $25,416.69. The corporation did not assume all of the liabilities of the partnership and an administrator was set up to arrange for the payment of the partnership's debts. As a general partner, petitioner agreed to pay a percentage *353 of his income from all sources for five years to the administrator. These payments were not paid specifically to discharge his obligation based on his negative capital account but, rather, were paid to satisfy the general debts of the partnership. His Federal tax refunds for the three years prior to 1970 were also required to be turned over to the administrator and petitioner was required to retain a national accounting firm to audit his returns and provide the administrator with a copy throughout the five-year period. In satisfaction of the general partnership obligations, petitioner paid in excess of $15,000, including the amounts from his tax refunds. A lawsuit was filed against the partnership and petitioner ultimately paid in 1980 more than $20,000 in cash in settlement of this lawsuit against the partnership. Petitioner did not include any of the total amount of $16,779.16 he received from the partnership in 1971 in the income reported on his Federal income tax return for that year. In his deficiency notice, respondent determined that the amount of $16,779.16 constituted guaranteed payments under section 707(c) and thus was taxable to petitioner as ordinary income. OPINION
*354 The only issue presented is whether the payments received by petitioner from his partnership in 1971 in the amounts of $16,666.66 and $112.50 were guaranteed payments.Section 707(c)[2] provides that payments made to a partner which are determined without regard to the income of the partnership with be includable in the partner's gross income under section 61(a) and deductible by the partnership under section 162(a). See section 1.707-1(c), Income Tax Regs. In determining whether the payments herein meet the requirements of this section, we must look to the substance of the transaction rather than its form. Falconer v. Commissioner,40 T.C. 1011, 1015 (1963). *355 The payments received by petitioner in the amount of $16,666.66 were all described on the partnership's books and records as "Salary." Petitioner, however, contends that these payments were made to him as a member of the partnership out of his own capital account and therefore were not guaranteed payments under section 707(c). Although the payments to petitioner were labeled as "Salary" on the books and records of the partnership, they were entered on petitioner's capital account first as a credit at the beginning of the month and then as a debit when a check was issued to petitioner. Under this method of entry, the payments actually "washed out" in the capital account, neither increasing nor decreasing the negative balance therein. In a typed page prepared by the partnership and given to petitioner in lieu of a Schedule K-1, the payments to him in 1971 of $16,666.66 were described as payments from his "Drawing account." However, the amount was subtracted from his distributive share of the partnership's loss for the year on the schedule, thereby reducing petitioner's distributive share of the 1971 partnership loss of $69,292.97 to a negative balance of $52,513.83 (after a reduction *356 of $112.50 for interest) which was to be charged to petitioner's capital account. Petitioner was unable to explain why this reduction was made in his distributive share of the loss. [3]
Respondent's principal argument is that, while debit entries to petitioner's capital account constitute withdrawals of capital, the credit entries of "Salary" at the first of each month to this same account are in fact salary payments against which petitioner was entitled *357 to draw for his living expenses. Petitioner argues that respondent puts too much weight on the credit entries to his capital account. He contends that the fact that these payments were registered as adjustments to petitioner's capital account is inconsistent with respondent's position that these payments were guaranteed payments under section 707(c). There is no showing in the record of the account initially charged on the partnership books when the credit entry was made to petitioner's capital account. The record does indicate that on its Form 1065 the partnership did not initially deduct these "credits" but upon audit of its returns a deduction was allowed for these amounts. The burden of proof in this case is on petitioner. Based on the record before us, we conclude that petitioner has failed to show that the $16,666.66 credited to his capital account as "Salary" which he withdrew in 1971 was not a guaranteed payment. Insofar as this record shows, this amount was paid to petitioner without regard to the partnership income and was payable in all events. For this reason petitioner has *358 failed to show error in respondent's determination that the $16,666.66 were guaranteed payments includable in his income. There is no evidence in the record as to the proper characterization of the $112.50 received by petitioner in 1971 which was described as interest on general cash capital. This amount was also used to reduce petitioner's distributive share of the partnership loss on the statement given to petitioner. Based on this record, we conclude that petitioner has failed to show that the $112.50 amount was not a guaranteed payment made to him without regard to the partnership income. We therefore sustain respondent with respect to the inclusion of this $112.50 in petitioner's 1971 income. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Sec. 707(c) provides as follows: (c) Guaranteed Payments.--To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a)↩ (relating to trade or business expenses).
3. See sec. 1.707-1(c), Example (2), Income Tax Reg., which states: Example (2).↩ Partner C in the CD partnership is to receive 30 percent of partnership income as determined before taking into account any guaranteed payments, but not less than $10,000. The income of the partnership is $60,000, and C is entitled to $18,000 (30 percent of $60,000) as his distributive share. No part of this amount is a guaranteed payment. However, if the partnership had income of $20,000 instead of $60,000, $6,000 (30 percent of $20,000) would be partner C's distributive share, and the remaining $4,000 payable to C would be a guaranteed payment.